## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **WADE ROBERTSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.   11-1919 (ESH)** |
| | ) | |
| **WILLIAM C. CARTINHOUR, JR. et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____)

### <u>MEMORANDUM OPINION</u>

This case involves parties and events that have been before this and other courts many times.  Previously, Wade Robertson sued William Cartinhour in this Court, but the jury found against Robertson and returned a verdict in Cartinhour's favor for $3.5 million in compensatory damages and $3.5 million in punitive damages for breach of fiduciary duties as a partner and as a lawyer and for legal malpractice.   Now, Robertson has sued Cartinhour and the lawyers who represented him, as well as several of Cartinhour's Serbian associates.  In this new suit, which was originally filed in the Southern District of New York, Robertson recasts as a conspiracy the events underlying the first suit, seeking to recover $3.83 million in damages based on claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and for fraud, defamation, and tortious interference.  Defendants have filed motions to dismiss all counts which, for the reasons set forth, will be granted.[1]

---

[1] All defendants have moved to dismiss except for Vesna Kustodic, Tanja Milicevic, and Aleksander Popovic.  To date, only Tanja Milicevic has been served and default was entered on February 23, 2012.

## BACKGROUND

### I.   ROBERTSON I

#### A.   Factual Background

The facts giving rise to the instant suit have been detailed in a raft of opinions, but most comprehensively in *Robertson I*, 691 F. Supp. 2d 65, 68 (D.D.C. 2010), and *In re* W.A.R. LLP, No. 11-cv-1574, 2012 U.S. Dist. LEXIS 9565 (D.D.C. Jan. 27, 2012).[2]   The long and tortured history of Robertson's relationship with Cartinhour and proceedings in appellate, district, and bankruptcy courts need not be restated at length here, but a summary of the factual and procedural history of Robertson's attempts to stop Cartinhour from recovering his $3.5 million investment in W.A.R., LLP ("WAR") is necessary to address the instant motions.

In September 2004, Robertson, an attorney, and Cartinhour, an 82-year-old retired physician, entered into a partnership, WAR, to invest in class action securities litigation. *Robertson I*, 691 F. Supp. 2d at 68.   From September 2004 to April 2006, Cartinhour contributed a total of $3.5 million.   *Id.*   From September 2004 to August 2009, Robertson allegedly contributed legal services, which he values at $3.83 million, almost entirely in the class action

---

[2] *See also Robertson v. Cartinhour*, 429 Fed. Appx. 1 (D.C. Cir. 2011); *In re* Robertson, No. 10-cv-5231, 2010 U.S. App. LEXIS 19454 (D.C. Cir. Sept. 15, 2010); *Robertson v. Cartinhour*, Nos. 10-cv-7015, 10-cv-7016, 10-cv-7044, 2010 U.S. App. LEXIS 10037 (D.C. Cir. May 14, 2010); *Robertson v. Cartinhour*, No. 10-cv-7017, 2010 U.S. App. LEXIS 25024 (D.C. Cir. Mar. 15, 2010); *Robertson v. Cartinhour*, No. 09-cv-1642 (Sept. 16, 2011); *Robertson v. Cartinhour*, No. 09-cv-1642 (July 19, 2011);  *Robertson v. Cartinhour*, No. 09-cv-1642, 2011 U.S. Dist. LEXIS 31959 (D.D.C., Mar. 28, 2011); *Robertson v. Cartinhour*, No. 09-cv-1642 (Dec. 30, 2010);  *Robertson v. Cartinhour*, No. 09-cv-1642 (May 17, 2010); *Robertson v. Cartinhour*, 711 F. Supp. 2d 136, 137 (D.D.C. 2010); *see also In re* W.A.R. LLP, No. 11-00044, 2011 Bankr. LEXIS 2650 (Bankr. D.D.C. July 11, 2011); *In re* W.A.R. LLP, 2011 Bankr. LEXIS 2599 (Bankr. D.D.C. July 6, 2011); *In re* W.A.R. LLP, No. 11-00044, 2011 Bankr. LEXIS 2448 (Bankr. D.D.C. June 23, 2011); *In re* W.A.R. LLP, No. 11-00044, 2011 Bankr. LEXIS 2273 (Bankr. D.D.C. June 15, 2011); *In re* W.A.R., LLP, No. 11-00044, 2011 Bankr. LEXIS 850 (Bankr. D.D.C. Mar. 16, 2011). All of the bankruptcy, district and appellate court proceedings associated with this first suit will be cited hereinafter as "*Robertson I*."

securities suit *Liu v. Credit Suisse First Boston Corp*, No. 04-cv-03757 (S.D.N.Y. 2004).  *Id*. at

68–69.  Ultimately, the *Liu* case was dismissed and, as a result, WAR recovered nothing.  *Id*. at

69; *Robertson I*, 2012 U.S. Dist. LEXIS 9565, at \*\*9–10.

Even though the *Liu* litigation was dismissed by the district court in April 2005,

Cartinhour contributed his final $1.5 million to WAR in April 2006 and, that same month, by

Robertson's request, Cartinhour signed three agreements.  *Robertson I*, 691 F. Supp. 2d at 68–69.

The first, the Indemnification Agreement, purported to release Robertson from all claims by

Cartinhour for "any future injuries, losses, or damages not known or anticipated" and required

Cartinhour to indemnify him for any damages if he filed suit against him.  *Id.* at 68–69.[3]  The

second was an amended partnership agreement giving Robertson "exclusive" control over WAR

and allowing partners to take out interest-free loans from WAR without having to repay them

until the partnership was liquidated.  *Id*. at 69 n. 5.  Third, Cartinhour signed an "Attestation and

Certification of No Attorney-Client Relationship with Wade Robertson," which relinquished any

claims that Cartinhour may have against Robertson "that could arise from any attorney-client

relationship, whether actual or mistakenly assumed, or otherwise."  *Id*. at 70.  One month later,

---

[3] The Indemnification Agreement, provided that it would "release, acquit, and forever discharge
Wade A. Robertson personally" from

> any and all past, present and future claims, counterclaims,
> demands, actions, causes of action, liabilities, damages, costs, loss
> of services, expenses, compensation, third-party actions, suits at
> law or in equity, of every nature and description, whether known
> or unknown, suspected or unsuspected, foreseen,  or unforeseen,
> real or imaginary, actual or potential, and whether arising at law or
> in equity, under the common law, state or federal law, or any other
> law, or otherwise, including, but not limited to, any claims that
> have been or might have been asserted as a result of any
> relationship[.]

*Id*. at 69 n. 4 (alternation in original).

the Second Circuit affirmed the district court's dismissal of *Liu* and the Supreme Court thereafter denied certiorari.  *Id* at 69.

Despite failures in the *Liu* litigation and unbeknownst to Cartinhour, Robertson borrowed $3.405 million from the partnership via two interest-free loans, the repayment of which was not due until January 2030 and January 2040, respectively.  *Robertson I*, 429 Fed. Appx. at 1.  He deposited this money into an account opened in his own name and quickly lost $1.9 million of this money in the stock market.  *See Robertson I*, Preliminary Injunction Hearing Tr. 93:3–6 (D.D.C. Mar. 26, 2010).  All of the money for the loans to Robertson came from Cartinhour's investment.  *Robertson I*, 2012 U.S. Dist. LEXIS 9565, at *13.

After the *Liu* litigation collapsed, Robertson stopped responding to Cartinhour's inquiries about the status of the case and his investment.  *Robertson I*, 691 F. Supp. 2d at 69.  Finally, on January 9, 2009, and February 6, 2009, Cartinhour's attorney, Albert Schibani, wrote a letter demanding that Robertson return Cartinhour's money.  (Compl. ¶ 72.)  When Robertson did not comply, another one of Cartinhour's attorneys, Carlton Obecny of the law firm Selzer Gurvitch Rabin & Obecny ("SGRO"),[4] sent two demand letters in August 2009 and threatened to file suit. (*Id*. ¶ 76.)   Robertson still did not return the money.  *Robertson I*, 691 F. Supp. 2d at 69.

### B.    *Robertson I*

Instead, on August 28, 2009, Robertson filed suit in this Court, seeking a declaratory judgment that he was not liable for Cartinhour's investment in WAR based on the  agreements signed by Cartinhour in April 2006 that supposedly authorized him to take interest-free loans and released him from all liability.  SGRO, on Cartinhour's behalf, answered,

---

[4] Obecny, Dattaro, Gurvitch, Polott, Rabin, Strickland, and Kearney are shareholders and managers of SGRO.  (*Id*. ¶ 18.)  Defendant Bramnick is a SGRO employee with some management responsibilities.  (*Id*.)

demanded the return of his investment, and counterclaimed for fraud, breach of fiduciary duty as

a partner and lawyer, legal malpractice, and various other torts and equitable causes of action.

*Robertson I*, 429 Fed. Appx. at 1–2.

In response to Cartinhour's counterclaims, Robertson filed an answer and asserted

"counter-counter claims" for breach of contract, setoff, quantum meruit, and misrepresentation

relating to his contributed legal services to WAR.[5]   However, since they were improperly

asserted in his answer as counter-counterclaims to Cartinhour's counterclaims, they were

therefore stricken upon Cartinhour's unopposed motion.  At the time, the Court informed

Robertson that those claims must be asserted by amending his complaint in accord with Rule 15.[6]

Nevertheless, he never did so.

As with Robertson's unrelated litigation in California,[7] the ensuing litigation here was

tumultuous.  His incessant filings—described as "vexatious," "meritless," "reckless," and "bad

faith"— ultimately elicited warnings and sanctions from this Court, as well as the Court of

Appeals, for frustrating proceedings and imposing unnecessary costs on Cartinhour.[8]

---

[5] *See Robertson I*, Pl.'s Answer to Def.'s Counter-Compl. and Counter Cls. Thereto. at 24–26 (D.D.C. Feb. 22, 2010).

[6] *See Robertson I*, Status Conf. Tr. 155:12–155:23, 166:22–167:3 (D.D.C. Mar. 22, 2010).

[7] This is not the first time that one of Robertson's complaints has given rise to myriad disputes and court decisions.  After Robertson's 2008 arrest in California for driving under the influence of alcohol, he sued the bar and the waiter for conspiring with the police to have him arrested. The dismissal of this case was affirmed by the Ninth Circuit after four years of litigation. *See Robertson v. Qadri*, 399 Fed. Appx. 219 (9th Cir. 2010); *see also Robertson v. Qadri*, No. 06-cv-04624, 2009 U.S. Dist. LEXIS 3790 (N.D. Cal. Jan. 21, 2009); *Robertson v. Qadri*, 2006 U.S. Dist. LEXIS 98881 (N.D. Cal. Mar. 25, 2008); *Robertson v. Qadri*, 2008 U.S. Dist. LEXIS 6525 (N.D. Cal. Jan. 17, 2008); *Robertson v. Qadri*, 2007 WL 3445084 (N.D. Cal. Nov. 13, 2007); *Robertson v. Qadri*, 2007 U.S. Dist. LEXIS 18750 (N.D. Cal. Mar. 1, 2007); *Robertson v. Qadri*, 2007 WL 1176635 (N.D. Cal. Apr. 20, 2007); *Robertson v. City of Palo Alto*, No. 08-cv-2176 (N.D. Cal. 2008); *Robertson v. Ryan*, No. 08-cv-2175 (N.D. Cal. 2008).

[8] *See Robertson I*, 711 F. Supp. 2d 136, 138–39 (D.D.C 2010) (imposing costs for obstructive discovery conduct and frivolous motion for reconsideration); *see also Robertson I,* No. 10-7033,

Robertson's litigiousness reached new heights when Cartinhour attempted to preserve the small amount of Cartinhour's $3.5 million that remained.  After it became apparent that Cartinhour's investment, $3.405 million of which had been moved by Robertson to his personal accounts though self-authorized loans, had been dissipated and only $700,000 remained in Robertson's personal accounts, the Court froze the accounts.  *Robertson I*, 691 F. Supp. 2d at 70–71.  In the midst of this, Robertson showed up at Cartinhour's home, without his attorneys' knowledge or consent, and threatened Cartinhour with "prolonged and costly" litigation if he did not settle.  *Id*. at 72.  Cartinhour's attorneys moved to enjoin Robertson from contacting him without counsel present, but the very next day and before this Court could rule, Robertson again went to Cartinhour's apartment and spoke to him through the door since Cartinhour refused to allow Robertson inside.  *Id*.  The Court, with the eventual consent of Robertson's counsel, issued a restraining order requiring Robertson to stay away from Cartinhour.  *See id*. at 72.  Subsequently on March 26, 2010, the Court entered a second freezing order, which was ultimately upheld on appeal by the D.C. Circuit.  *Robertson I*, 429 Fed. Appx. at 1–2, 4.

Increasingly dissatisfied with the proceedings in this Court, Robertson unleashed a barrage of motions in this Court and the Court of Appeals.  In addition, he moved for recusal, arguing that that Court was biased.  *Robertson I*, 691 F. Supp. 2d at 74.  When that motion was

Order at 1 (D.C. Cir. Oct. 19, 2010) (imposing costs for unwarranted filing of fourth motion to stay district court proceedings).  Prior to imposing those sanctions, the Circuit Court had summarily denied: Robertson's motion for disqualification and sanctions against Cartinhour's counsel, *see Robertson I*, No. 10-7033, Order at 1 (D.C. Cir. Sept. 21, 2010); Robertson's petition for mandamus seeking recusal, *see Robertson I*, No. 10-5231, 2010 U.S. App. LEXIS 19454, at *1 (D.C. Cir. Sept. 15, 2010); Robertson's motion for clarification and reconsideration, where the Court explicitly warned him that it "will not hesitate to impose sanctions" under 28 U.S.C. § 1927 and D.C. Cir. Rule 38, *see Robertson I*, No. 10-7033, Order at 1–2 (D.C. Cir. Sept. 3, 2010); Robertson's emergency motion to stay a preliminary injunction, *see Robertson I*, No. 7033, Order at 1 (D.C. Cir. June 16, 2010); and Robertson's motion for sanctions and a stay, noting that certain orders of the district court were unappealable, *see Robertson I*, No. 10-7033, Order (D.C. Cir. May 14, 2010).

denied, he again went to the Court of Appeals, but his request for a new judge, his petition for a

writ of mandamus ordering recusal, and his many interlocutory appeals were summarily denied.[9]

Finally, he filed a motion in the Court of Appeals to sanction and disqualify Cartinhour's

attorneys in *Robertson I*, arguing that they had fabricated evidence and had failed to disclose key

facts, which was also denied as groundless and unwarranted.  *Robertson I*, Order, 10-7033 (D.C.

Cir. Sept. 21, 2010).

###   C.      The Trial

The legal claims and defenses presented in *Robertson I* were tried to a jury over six days

in February 2011.  The jury heard evidence relating to the signing of the original WAR

partnership agreement, the Indemnification Agreement, and the Attestation of No Attorney-

Client Relationship.

At trial, Robertson argued that the WAR partnership agreement and other agreements

were valid, knowing, and voluntary.[10]  He claimed that he was not liable to Cartinhour because

he had not been Cartinhour's attorney, Cartinhour understood the agreements he signed, and

Cartinhour had been represented by independent attorney, Robert "Larry" Ash, when he signed

the partnership agreement.[11]  Robertson cross-examined both Cartinhour[12] and Ash,[13] and both

---

[9] *Robertson I*, No. 10-5231, 2010 U.S. App. LEXIS 19454 (D.C. Cir. Sept. 15, 2010); *see also Robertson I*, 429 Fed. Appx. at 4.  Undaunted, Robertson recently filed yet another motion for recusal in the instant suit, which is addressed in a separate Memorandum Opinion and Order issued today.

[10] Trial Tr. 108:15–109:12 (Feb. 8, 2011) [hereinafter "Tr. Tr. [date],"]; Tr. Tr. 2/16/11, 49:08.

[11] Tr. Tr. 2/14/11, 101:03–101:15.

[12] Tr. Tr. 2/17/11, 77:10–79:09.

[13] Tr. Tr. 2/8/11, 12:20–12:22; 14:03–14:05; 92:01–92:05; Tr. Tr. 2/14/11, 5:19–15:25; *see also id*. 17:17–20:15.

testified that Ash had not reviewed any of the agreements Cartinhour signed, consulted with Cartinhour about the agreements, or represented him on the matter.[14]

On February 18, 2011, after a day of deliberations, the jury returned a $7 million verdict in Cartinhour's favor: $3.5 million in compensatory damages and $3.5 million in punitive damages.  In response to Cartinhour's special verdict form, the jury found that an attorney-client relationship existed between Robertson and Cartinhour, that Robertson breached his fiduciary duties to Cartinhour as his business partner and as an attorney, and that Robertson committed legal malpractice.  *See Robertson I*, Verdict Form (Feb. 18, 2011).  In addition, the jury found that the Indemnification Agreement was procured by undue influence, was unconscionable, and thus, was unenforceable by Robertson.  *Id.*[15]

In his appeal, Robertson challenges this verdict and objects to many of the Court's rulings, arguing that the Court should have enforced the partnership and indemnification agreements, and challenging the ruling that any recompense for his services must be asserted as a claim against the partnership rather than Cartinhour.  *Robertson I*, No. 11-7026, Corrected Br. for Appellant at 33, 48 (D.C. Cir. Jan. 4, 2011) ("*Robertson I* Appeal Br.").  Further, he contends that the trial was fundamentally unfair because of the purported misrepresentations by Cartinhour and his attorneys during discovery and pretrial proceedings.  *Id.* at 56.

### D.      Bankruptcy Proceedings

---

[14] *See* Tr. Tr. 2/17/11, 84:01–84:11; Tr. Tr. 2/14/11, 17:17–20:15.

[15] At that point, the Court denied Robertson's equitable claim for a setoff because he sought money for services rendered to WAR and, therefore, his defense was improperly asserted against Cartinhour.  *Robertson I*, Minute Order (D.D.C. Feb. 24, 2011). The remaining counterclaims, including Cartinhour's counterclaim for rescission, were voluntarily withdrawn and dismissed by the Court with prejudice.  *Robertson I*, Judgment at 1 (D.D.C. Feb. 25, 2011).  Robertson's claim for declaratory relief was also dismissed with prejudice.  *Id.*  Robertson moved for judgment as a matter of law at the close of Cartinhour's evidence and again at the close of all evidence, which this Court denied.  *See Robertson I*, Order (D.D.C. Mar. 28, 2011).

In an effort to sidetrack the trial in *Robertson I* and to find a more favorable forum, Robertson filed first for a stay,[16] then initiated actions in <u>two</u> other jurisdictions.

First, in the Western District of Tennessee, Robertson sought to stay *Robertson I* based on bankruptcy proceedings filed against WAR. The Tennessee bankruptcy court, as well as this Court, rejected his attempts to invoke the automatic stay provision of the U.S. Bankruptcy Code, 11 U.S.C. § 362, ruling that "[it] does not stay claims against Robertson because he is not the debtor." *See Robertson I*, 2012 U.S. Dist. LEXIS 9565, at **6–8.

The Tennessee bankruptcy court transferred the case to the District of Columbia Bankruptcy Court on January 4, 2011, due to the significant adversarial proceedings already underway in the District of Columbia.[17]  *Robertson I*, 2012 U.S. Dist. LEXIS 9565, at *9. Finding "no property available for distribution from the estate," the bankruptcy trustee in this Court filed a report of no distribution on March 30, 2011, *id*. at **9–10,  which was affirmed by Bankruptcy Court Judge Teel and then by Chief Judge Lamberth.  *Id.* at *20.

---

[16] The Circuit also rebutted Robertson's efforts to delay the trial in an Order dated October 19, 2010: "[t]his Court has previously denied appellant's earlier motions for stay, and the district court's setting of a date for trial on the merits does not warrant the filing of yet another stay motion." *Robertson I*, No. 10-7033.

[17] Robertson appealed the Tennessee bankruptcy court's transfer order and he also sought sanctions, injunctive relief, damages, contempt proceedings, and to declaration that the District of Columbia bankruptcy court's judgment void.  *Robertson I*, Joint Mot. for Sanctions, Injunctive Relief, Damages, Contempt Proceedings, and to Declare J. Void, 2:11-cv-02082 (W.D. Tenn. Mar. 8, 2011).  Subsequently, he withdrew his motion, *see Robertson I*, 2:11-cv-02082, Mot. to Withdraw Contempt Mot., (W.D. Tenn. Mar. 17, 2011), and his appeal of the transfer order was denied.  *Robertson I*, Order on Bankruptcy Appeal, 2:11-cv-02082 (W.D. Tenn. Apr. 18, 2011).

## II.   *ROBERTSON II*

Second, he filed a new suit in the Southern District of New York ("*Robertson II*"),[18]

naming Cartinhour, all of the lawyers who were working on *Robertson I*,[19] and a cast of others.

*See Robertson II*, No. 10-cv-8442, 2011 U.S. Dist. LEXIS 126030, at *13 (S.D.N.Y. Nov. 9,

2010).  Although it was styled as a civil RICO complaint, it centered on the same facts and

claims as were presented in *Robertson I*.  The defendants who had been served (Cartinhour and

his lawyers) filed a motion to dismiss or, in the alternative, to transfer the case to the District of

Columbia, which Judge Swain granted, observing:

> Robertson's decision to file suit in the Southern District of New
> York appears to have been principally a tactical maneuver to avoid
> the jurisdiction of the D.C. Court, and so should be accorded little
> deference.

*Id.*[20]  Upon transfer, this case was initially assigned to Judge Bates.  Robertson filed a Notice of

Related Case in *Robertson II* but, contrary to his obligations to the Court, he identified <u>only</u> the

bankruptcy case as related under LCvR 40.5(b)(3).[21]  Defendants, however, filed notice

---

[18] All the proceedings relating to this case in this Court and the Second Circuit will be cited as
"*Robertson II*."

[19] These lawyers, defendants Schibani, Kearney, Bramnick, Selzer, Obecny, Dattaro, Gurvitch,
Polott, Rabin, and Strickland will be referenced collectively as the "attorney-defendants,

[20] While those motions were pending, Robertson sought a stay pending decisions on his efforts to
have the judgment in *Robertson I* declared void.  *Robertson II*, Corrected Mot. for Stay and Mot.
for Entry of Default (D.D.C. Mar. 16, 2011).  When Judge Swain transferred the case after trial
in *Robertson I*, she reasoned that "having entered judgment in the underlying D.C. Action and
having presided over that jury trial, [it] is in the best position to review any further briefing and
make res judicata determinations."  *Robertson II*, 2011 U.S. Dist. LEXIS 126030, at *13.
Accordingly, Judge Swain terminated defendants' motions to dismiss without prejudice and
denied Robertson's motion for a stay.  *Id.*  Robertson has petitioned the Second Circuit for a writ
of mandamus to vacate Judge Swain's transfer order,  *Robertson II*, Pet., 11-4925 (Nov. 29,
2011), which is still pending.

[21] *Robertson II*, Notice of Related Case (D.D.C. Nov. 16, 2011).

identifying this case as related to *Robertson I*.[22]  Thereafter, the case was reassigned to this Court.

In a total about-face, Robertson now claims in *Robertson II* that *he* was the victim and that it was he who was defrauded by Cartinhour into entering into their partnership agreement, and by Cartinhour and his lawyers' actions in *Robertson I*, which constitute evidence of a RICO conspiracy against him.[23]

Specifically, his first RICO claim centers on an alleged criminal enterprise consisting of Cartinhour, his attorneys in *Robertson I*, and members of the William C. Cartinhour, Jr. Foundation, a Serbian charity ("Charity") (Compl. ¶¶ 43, 52), to which Cartinhour's financial interest in WAR was assigned.  He claims that he was fraudulently induced by Cartinhour to enter into and remain in the partnership, that Cartinhour was the one pulling the wool over his eyes, and that all defendants are liable for predicate acts including immigration fraud, tax fraud, extortion, and misrepresentations during the *Robertson I* litigation.[24]  (*Id.* ¶¶ 112, 114, 120, 122; Pl.'s Opp'n to Defs.' Mots. to Dismiss ("Pl.'s Opp'n") at 5–8.)

---

[22] *Robertson II*, Mot. to Reassign Case (D.D.C. Nov. 17, 2011).

[23] In this new complaint, Robertson adds one factual allegation to those at issue in *Robertson I*, which relates to Tim Gray, the accountant who submitted an affidavit in support of Robertson's accounting of WAR's accounts.  *See Robertson I*, Response to Order of the Court (D.D.C. Jan. 4, 2010).  Previously, Gray had submitted an affidavit in the California case (*see supra* note 7), and Robertson alleges that in January or February 2010, a Maryland attorney called opposing counsel in the California case and accused Gray and Robertson of scheming to defraud Cartinhour. (Compl. ¶¶ 86, 89.)  He also alleges that a letter to this effect was sent to Gray's landlord and that it resulted in Gray's eviction, but neither Robertson nor Gray have seen the letter.  (*Id.*) Robertson claims, based on "information and belief," that this call was made by Kearney, Bramnick, or someone acting in concert with them, given their role in and knowledge from *Robertson I* and their motive, which "no other identifiable person had."  (*Id.*)

[24] In *Robertson II*, plaintiff ascribes sudden significance to facts which he knew in *Robertson I*, namely that he and Cartinhour had discussed merging WAR and TCT, LLC, a company Cartinhour owned and which Robertson alleges committed tax and immigration fraud. However,

His second RICO claim names Cartinhour's attorneys in *Robertson I* as a racketeering

enterprise based on his accusation that they committed wire and mail fraud, extortion,

obstruction of justice, and witness retaliation based on acts including failing to disclose Ash's

name in discovery requests, filing an inaccurate letter stating that Robertson was Cartinhour's

counsel for TCT, making defamatory statements about Gray, and presenting false affidavits.  (*Id.*

¶¶ 128, 130, 136, 138; Pl.'s Opp'n at 5–8.)

In addition, he charges all defendants with fraud, defamation, business defamation and

tortious interference based on these same allegations.  (*Id.* ¶¶ 141–49.)

In terms of damages, Robertson contends that he is owed $3.83 million in legal services

to WAR (*id.* ¶ 106), which is the very setoff he sought—and still seeks— in *Robertson I*.  *See*

*Robertson I* Appeal Br. at 48.  He conveniently omits any mention of the $3.405 million of

Cartinhour's money that he loaned himself, the $1.9 million he lost in the stock market, or the $7

million judgment in *Robertson I*, most of which remains unsatisfied.

Cartinhour and the attorney-defendants have filed motions to dismiss all counts. [25]

## ANALYSIS

## I.   EFFECT OF PRIOR PROCEEDINGS

Given the significant overlap in *Robertson I* and *Robertson II*, many of Robertson's

claims are barred by res judicata,[26] judicial estoppel, and the requirement that challenges to trial

---

they never took any steps toward a merger, Robertson helped him close down TCT, and, in any
event, these events did not arise post-trial.

[25] These motions were timely-filed in accord with this Court's order (*see Robertson II*, Order
(D.D.C. Dec. 12, 2011)), and therefore Robertson's argument that they are time-barred is
meritless.

[26] Contrary to Robertson's contention (Pl.'s Opp'n at 27), the law is well established that res
judicata may be raised in a motion to dismiss.  *See, e.g.*, *Lopez v. Am –Islamic Rels. Action*

procedures be litigated on appeal rather than by initiating new cases. Consequently, he is precluded from now claiming that Cartinhour was the one who defrauded him with respect to the partnership agreements, that Cartinhour owes him for his services to WAR, that he did not serve as Cartinhour's attorney after they entered into the partnership agreements, and that Cartinhour and his attorneys engaged in a conspiracy against him and this Court through their litigation conduct in *Robertson I*.

"The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). "By 'preclud[ing] parties from contesting matters that they have had a full and fair opportunity to litigate,' these two doctrines protect against 'the expense and vexation attending multiple lawsuits, conserv[e] judicial resources, and foste[r] reliance on judicial action by minimizing the possibility of inconsistent decisions.'" *Id.* (quoting *Montana v. United States*, 440 U.S. 147, 153–54 (1979)); *see also Hardison v. Alexander*, 655 F.2d 1281, 1288 (D.C. Cir. 1981) ("The doctrine is designed to conserve judicial resources, avoid inconsistent results, engender respect for judgments of predictable and certain effect, and [] prevent serial forum-shopping and piecemeal litigation.").

Claim preclusion "bars relitigation not only of matters determined in a previous litigation but also ones that a party could have raised," *NRDC v. Thomas*, 838 F.2d 1224, 1252 (D.C. Cir. 1988),[27] to prevent "litigation of matters that should have been raised in an earlier suit." *SBC*

---

*Network, Inc.*, 657 F. Supp. 2d 104, 108–09 (D.D.C. 2009), *aff'd*, 383 Fed. Appx. 1 (D.C. Cir. 2010).

[27] Claim preclusion applies "'if there has been prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction.'" *NRDC v. EPA*, 513 F.3d 257, 260 (D.C. Cir. 2008) (quoting *Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006)).

*Communs., Inc. v. FCC*, 407 F.3d 1223, 1230 (D.C. Cir. 2005) (quoting *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 376 n.1 (1985)).[28] Issue preclusion, by contrast, "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." *Taylor*, 553 U.S. at 748 (quoting *New Hampshire*, 532 U.S. at 748–49).[29]  A defendant who was not a party to the earlier litigation may assert issue preclusion as a defense "to prevent a plaintiff's litigation of issues the plaintiff previously litigated and lost" even though the defendant is not bound by the prior judgment.  *See McCord v. Bailey*, 636 F.2d 606, 609 n.1 (D.C. Cir.1980) (citing *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 328–29 (1971); *Parklane Hosiery v. Shore*, 439 U.S. 322, 329–331 (1979)).

In *Robertson II*, he now claims that Cartinhour was the one who defrauded him and misrepresented his intentions regarding WAR,[30] and he contends that he is owed money for the in-kind legal services that he provided to the attorneys who worked on the *Liu* litigation.[31]  As an

---

[28] *See also Taylor*, 553 U.S. at 748 ("Under the doctrine of claim preclusion, a final judgment forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.'") (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)).

[29] For issue preclusion to apply, "'[1], the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case [; 2], the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case [; and] [3], preclusion in the second case must not work a basic unfairness to the party bound by the first determination.'"  *Martin v. Dep't of Justice*, 488 F.3d 446, 454 (D.C. Cir. 2007) (quoting *Yamaha Corp. of Amer. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992)).

[30] Compl. ¶¶ 27–37, 39–41, 43, 45–46, 50–55, 66, 67, 75–77, 79, 81, 104–06, 109, 112–14, 117, 120–23, 141–43.

[31] *Id*. ¶¶ 31–32, 38, 40, 42, 68, 70, 93.  Robertson never entered his appearance in that case since he claimed that, since he "had at one point been an employee for one of the defendants [*i.e.*, Credit Suisse]," he feared that the defendant "might somehow create this side show that might detract" from the *Liu* plaintiffs' case if his name appeared as an attorney.  *Robertson I*, 691 F. Supp. 2d at 70 n.6.

initial matter, Robertson has already asserted his claim for those services, and this Court has ruled that he cannot seek it from Cartinhour, as opposed to the partnership. *See Robertson I*, Minute Order (Feb. 24, 2011).[32]   If his aim is to say that the alleged fraud rendered the partnership agreement invalid and therefore he can now bring claims against Cartinhour for his services, that claim would be barred as well.   He had the opportunity to amend his complaint to assert fraud or any other legal claims, but chose not to do so.   *See Robertson I*, Status Conf. Tr. 155:12–23, 166:22–167:03 (D.D.C. Mar. 22, 2010).   Res judicata precludes him from doing so now because it would essentially nullify the jury's findings in *Robertson I*.   *See Capitol Hill Group v. Pillsbury, Winthrop, Shaw, Pittman, LLC*, 569 F.3d 485, 492 (D.C. Cir. 2009) (explaining that res judicata bars claims when "the successful prosecution of the second action would nullify the initial judgment or impair the rights established in the initial action") (quoting *Restatement (Second) of Judgments* § 22(2)(b)).   Nor can Robertson avoid the jury's finding that Robertson and Cartinhour in fact had an attorney-client relationship.   Therefore, res judicata bars his claims that Cartinhour's sworn affirmations of such a relationship constitute wire fraud, mail fraud, extortion, and obstruction of justice.[33]   Despite the fact that Robertson attempts to restyle his claims, "[t]here are no new facts.   [He] is simply raising a new legal theory.   This is precisely what is barred by res judicata."   *Apotex, Inc. v. FDA*, 393 F.3d 210, 217–18 (D.C. Cir. 2004).[34]

---

[32] Moreover, during the *Robertson I* trial, evidence of the setoff was not permitted to be presented to the jury since it was an equitable claim that did not rebut Cartinhour's legal claims. However, his equitable claim for a setoff was raised, considered, and ultimately rejected after Cartinhour withdrew his equitable claims.   *Robertson I*, Order (D.D.C. Nov. 29, 2010).

[33] *See also* Compl. ¶¶ 33–34, 36–37, 66, 81–83, 85, 90, 92.

[34] None of the events arose post-trial, but rather he was aware of these issues well before trial.   It defies logic to suggest, as plaintiff has done (*see* Pl.'s Opp'n at 28–29), that the principles of res judicata permit him to ignore facts learned in discovery so that he can later bring a new suit with a different interpretation if he loses the first time.

Judicial estoppel also precludes him from now attacking the validity of the partnership agreement because it "'prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.'" *New Hampshire*, 532 U.S. at 749 (quoting 18 *Moore's Fed. Practice* § 134.30 (3d ed. 2000)).[35]  In *Robertson I* and his appeal, Robertson argued that the partnership agreement was valid and enforceable.  To permit Robertson to argue the opposite now would impose substantial hardship on Cartinhour, who has spent significant money and years of his life embroiled in litigation with Robertson.

Finally, Robertson's claims regarding misrepresentations by Cartinhour and his attorneys during *Robertson I* cannot be recast as predicate acts for a RICO claim or a fraud claim.[36]  He made these same arguments[37] unsuccessfully to the Court of Appeals when seeking to sanction and disqualify Cartinhour's attorneys, [38] and Cartinhour's alleged misrepresentations have again

---

[35] To decide whether judicial estoppel applies, a court must ask

> (1) Is a party's later position clearly inconsistent with its earlier position? (2) Has the party succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled? (3) Will the party seeking to assert an inconsistent position derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped?

*Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 798 (D.C. Cir. 2010).

[36] *See* Compl. ¶¶ 75–78, 80–82, 83, 85, 90–92, 94–98.

[37] Specifically, he alleged that the attorney-defendants failed to disclose Ash's identity and had fabricated Cartinhour's affidavit which was submitted in support of the preliminary injunction issued Mar. 26, 2010.  *See Robertson I*, 10-7033, Mot. to Disqualify at 3, 5–6 (D.C. Cir. Aug. 18, 2010).

[38] *Robertson I*, Order, 10-7033 (D.C. Cir. Sept. 21, 2010) ("Appellant has failed to demonstrate the requested relief is warranted. In any event, the matter at issue is the subject of bar complaints filed by appellant and will undoubtedly be thoroughly explored in that context.").

been raised in the *Robertson I* appeal.[39]  Nonetheless, he attempts to make four separate

predicate acts out of the alleged failure to disclose Ash in discovery documents, and three more

based on Cartinhour's statement that he was not represented by Ash when signing the initial

partnership agreement.  (Compl. ¶¶ 80–82, 83, 90, 95–98; *see also* Pl.'s Opp'n at 6–8.)

Moreover, the belated disclosure of Ash's role was of no consequence in the prior litigation since

Robertson deposed him months before trial, he cross-examined both Ash and Cartinhour at

trial,[40] and neither Ash nor Cartinhour supported Robertson's contention that Ash reviewed the

agreements prior to Cartinhour signing them.  (*See supra* nn. 12–14.)

      If litigants are permitted to do what Robertson attempts here—that is bring entirely new

law suits based on alleged errors (particularly harmless ones) in earlier suits—the concept of

finality would be rendered a nullity.  It is for this reason that "[t]he appeal process is available to

correct error; subsequent litigation is not."  *See Hardison v. Alexander*, 655 F.2d 1281, 1288

(D.C. Cir. 1981); *Restatement (Second) of Judgments*, § 19 ("The general rule stated in this

Section requires that errors underlying a judgment be corrected on appeal or other available

proceedings to modify the judgment or to set it aside, and not made the basis for a second action

on the same claim.")[41]  Robertson has exercised his right of appeal and that is all he is entitled

under our judicial system.

---

[39] *See, e.g.*, *Robertson I* Appeal Br. at 24, 56.

[40] In the instant case, he neglects to mention that he became aware of Ash's existence well before trial and the close of discovery was extended to allow him to take Ash's deposition.  *See* Tr. Tr. 2/14/11, 5:19– 21:25; *id.* 17:17–20; *Robertson I*, Order (D.D.C. July 2, 2010).

[41] The Seventh Circuit has described this doctrine as "simply preclud[ing] actions taken in the adversarial setting of litigation and otherwise redressable through court process from supporting further litigation."  *Probst v. Ashcroft*, 25 Fed. Appx. 469, 471 (7th Cir. 2001).

## II.   JUDICIAL PROCEEDINGS PRIVILEGE

Robertson also asserts claims against the attorney-defendants based on these same

alleged misrepresentations during *Robertson I* relating in large part to Ash.  (*See* Pl.'s Opp'n at

6–8; Compl. ¶¶ 80–83, 85, 90–92, 94–98.)[42]   As noted above, this is a familiar refrain.[43]

Nonetheless, Robertson argues that he may raise this issue here because the attorney-defendants

were not parties in *Robertson I*.  (Pl.'s Opp'n at 29.)[44]

This argument is unavailing.  The attorney-defendants' representations in litigation

cannot be a basis for suit because they are protected by the judicial proceedings privilege.  This

"absolute" privilege "'protects the attorney from liability . . . irrespective of his purpose . . . , his

belief in its truth, or even his knowledge of its falsity.'"  *Finkelstein, Thompson & Loughran v.*

*Hemispherx Biopharma, Inc.*, 774 A.2d 332, 338 (D.C. 2001) (quoting *Restatement (Second) of*

*Torts* § 586 cmt. a).  "For the absolute immunity of the privilege to apply, two requirements must

be satisfied: (1) the statement must have been made in the course of or preliminary to a judicial

proceeding; and (2) the statement must be related in some way to the underlying proceeding."

*Arneja v. Gildar*, 541 A.2d 621, 623 (D.C. 1988).

---

[42] The exception is Robertson's allegation that the attorney-defendants submitted an affidavit to this Court that was falsely attributed to Cartinhour.  (*Id.* ¶ 83.)  This alleged misrepresentation has also been raised in the *Robertson I* appeal.  *Robertson I* Appeal Br. at 64.

[43] *See, e.g.*, *Robertson I* Appeal Br.; *Robertson I*, Status Conf. Tr. 14:15–15:14 (D.D.C. July 22, 2010).  Although he had the opportunity to move for sanctions, *see id.*, he failed to do so.

[44] While a claim against a non-party would not ordinarily be barred by res judicata, the attorney-defendants could arguably be considered "privies" of Cartinhour and thus entitled to claim preclusion as well.  *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 (1979) ("Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action.").

Clearly, this privilege applies to the attorney-defendants' submissions of Cartinhour's affidavits to this Court, statements to the Court, and discovery responses in *Robertson I*. *McNair Builders, Inc. v. Taylor*, 3 A.3d 1132, 1135 n.1 (D.C. 2010) (applying the judicial proceedings privilege to preclude claims of fraud and misrepresentation).  It also applies to the demand letters which warned Robertson of the litigation that eventually materialized when Cartinhour filed his counterclaims in *Robertson I*.  *See Messina v. Fontana*, 260 F. Supp. 2d 173, 178 (D.D.C. 2003) (explaining that "'[t]he fact that the statements were made prior to the filing of an action . . . does not . . . defeat the privilege . . . . The statements were made in contemplation of litigation to the very individuals who would have an interest in the outcome of such litigation.'") (alteration in original) (quoting *Conservative Club of Washington v. Finkelstein*, 738 F. Supp. 6, 14 (D.D.C. 1990)), *aff'd*, *Messina v. Krakower*, 439 F.3d 755, 759–61 (D.C. Cir. 2006).

The principles applicable here—res judicata, the judicial proceedings privilege, and the requirement that challenges to trial court rulings and procedures be litigated on appeal— have a common purpose: to prevent parties from relitigating issues that were already litigated or could have been litigated before.  These doctrines preclude Robertson from claiming that Cartinhour defrauded him with respect to the partnership agreements (Compl. ¶¶ 36–37, 39, 41, 67); that Cartinhour owes him for his services to WAR (*id*. ¶¶ 106, 115, 123, 131, 139); that he was extorted when Cartinhour's attorneys demanded that he return Cartinhour's money *(id*. ¶¶ 72–78); or that the defendants defrauded him and this Court through misrepresentations during the course of the *Robertson I* litigation.  (*Id.* ¶¶ 80–83, 85, 90–92, 94–98.)

## III.    RICO CLAIMS (COUNTS I-IV)

Once these claims are eliminated, little, if anything, remains except for vague allegations that the Charity was a sham and claims about Tim Gray.[45]  These remaining RICO claims cannot survive.

### A.    Legal Standard for Civil RICO Claims

A RICO violation under § 1962(c) consists of four elements: (1) conducting (2) an enterprise (3) through a pattern (4) of racketeering activity.  *W. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*, 235 F.3d 629, 633 (D.C. Cir. 2001); *see* 18 U.S.C. § 1962(c) ("It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity . . . .").  "Racketeering activity" refers to the commission of statutorily-defined predicate criminal acts.  *W. Assocs. Ltd. P'ship*, 235 F.3d at 633.[46]  Conspiring to violate any subsection of 18 U.S.C. § 1962 is a separate violation of the RICO statute.  *See* 18 U.S.C. § 1962(d).

To establish a pattern of racketeering activity under RICO, there must be at least two overt acts, 18 U.S.C. § 1961(5), which must be related and "amount to or pose a threat of continued criminal activity."  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

---

[45] The allegations that remain are: TCT, LLC and its "co-conspirators" were engaged in tax and bank fraud (*id*. ¶¶ 47–49); the Charity was engaged in immigration fraud and extorted Robertson so that he did not report it (*id*. ¶ 57); the Charity extorted an unnamed Serbian businessman (*id*. ¶ 58); and someone associated with the SGRO attorneys defamed Robertson and Gray by accusing them of defrauding Cartinhour.  (*Id*. ¶ 89).

[46] Racketeering activity includes the predicate acts: extortion (violation of 18 U.S.C. § 1951); obstruction of justice (violation of 18 U.S.C. § 1503); mail fraud (violation of 18 U.S.C. § 1341); wire fraud (violation of 18 U.S.C. § 1343); and financial institution fraud (violation of 18 U.S.C. § 1343).  *See* 18 U.S.C. § 1961 (listing offenses that qualify as predicate acts which constitute racketeering activity).

"[C]ontinuity" refers 'either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.'" *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1264 (D.C. Cir. 1995) (quoting *H.J. Inc*, 492 U.S. at 241). To determine whether closed-ended continuity has been established, the court must consider "[1] the number of unlawful acts, [2] the length of time over which the acts were committed, [3] the similarity of the acts, [4] the number of victims, [5] the number of perpetrators, and [6] the character of the unlawful activity." *Edmondson*, 48 F.3d at 1265 (quoting *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1411-13 (3d Cir. 1991)).  These factors "should be applied in a manner that is fluid, flexible, and commonsensical, rather than rigid or formulaic." *W. Assocs. Ltd. P'ship*, 235 F.3d at 637.  However, it is clear that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the closed period] requirement." *H.J. Inc.*, 492 U.S. at 242.

RICO authorizes civil enforcement by "any person injured in his business or property by reason of a violation of [the RICO statute]."  18 U.S.C. § 1964(c).  Therefore, standing to sue under RICO requires a plaintiff to allege that (1) he suffered an injury to his business or property and (2) the predicate acts were the proximate cause of the injury.  *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992).  Further, the plaintiff must show "some *direct* relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268 (emphasis added); *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006) (reaffirming *Holmes*).  "A link that is too remote, purely contingent, or indirect is insufficient." *Hemi Grp., LLC v. City of New York*, 130 S. Ct. 983, 989 (2010) (internal citations omitted).

### B.    *Robertson II*'s RICO Claims (Counts I–IV)

Robertson alleges two patterns of racketeering with two enterprises—one being the Charity, plus Cartinhour and some attorney-defendants, and the other being the SGRO attorney-

defendants.  These form the basis for two substantive RICO violations under 18 U.S.C. § 1962(c)

and two counts of conspiracy to violate RICO under 18 U.S.C. § 1962(d).  (*See* Pl.'s Opp'n at 2.)

In Counts I and II, Robertson alleges that the Charity, Cartinhour, and certain SGRO

attorneys constitute a criminal enterprise that has engaged in a pattern of racketeering consisting

of predicate acts of mail fraud, wire fraud, financial institution fraud, extortion, obstruction of

justice, and witness retaliation.  (Compl. ¶¶ 112, 114, 120, 122; Pl.'s Opp'n at 2, 5–6, 8.)[47]

These allegations are based on Robertson's contentions that the Charity committed immigration

and tax fraud, extorted him by attempting to prevent him from reporting it, extorted an unnamed

Serbian businessman, and that Kearney, Bramnick, or someone acting along with them made

statements regarding Gray to a California attorney and Gray's landlord.  (*Id*. at 17–21.)[48]

In Counts III and IV, Robertson alleges that SGRO is the relevant enterprise and that it

has engaged in a pattern of racketeering through mail fraud, wire fraud, obstruction of justice,

and witness retaliation based on the statements about about Tim Gray.  (Compl. ¶¶ 128, 130, 136,

138; Pl.'s Opp'n at 3–4, 6–8.)[49]

---

[47] These counts implicate Cartinhour, Milicevic, Kustudic, Popovic, Schibani, as employees or officers of the Charity; Bramnick, Kearney, Obecny, Selzer, as attorneys employed by the Charity; and Dattaro, Gurvitch, Polott, Rabin, and Strickland under a theory of respondeat superior.  (*Id*. ¶¶ 113, 116, 121, 124).  Because this claim will be dismissed on other grounds, the Court need not decide whether this disparate group of individuals passes muster as an "enterprise" under RICO.

[48] He also alleges that Cartinhour defrauded him by inducing him to invest his services in WAR and by failing to disclose the Charity's illegal activity.  (Pl's Opp'n at 18 –19.)  As previously discussed, these claims are barred by the doctrine of res judicata.

[49] These counts implicate the attorney-defendants employed by SGRO—Bramnick, Dattaro, Gurvitch, Kearney, Obecny, Polott, Rabin, Selzer, and Strickland—through either direct or vicarious liability.  (Compl. ¶¶ 131–132, 139–40).  He also alleges that SGRO's RICO activity includes the demand letters sent on Cartinhour's behalf and SGRO's alleged misrepresentations in the course of *Robertson I*.  (*Id*. ¶¶ 72, 80–82, 89.)  As discussed above, these claims are barred by the judicial proceedings privilege.

Robertson's RICO claims fail for a variety of reasons.  First, he lacks standing to bring any of these RICO claims since he has not been injured "by the conduct constituting the [RICO] violation."  *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).  Even if plaintiff was not recompensed for the time he allegedly spent on the *Liu* action, and even if such a claim were not barred, there is simply no direct connection between the alleged predicate criminal act and the injury for which he seeks to recover.  *Anza*, 547 U.S. at 461 ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.")

Plaintiff's only allegation of injury is the loss of $3,833,440.00, which supposedly represents the sum of his uncompensated legal services to WAR.  (Compl. ¶¶ 106, 115, 123, 139.)[50]  However, his litany of predicate acts did not the cause this loss.  Rather, Robertson could not collect for his time because the *Liu* litigation failed, and as a result, WAR had no income and the partnership had no funds to distribute.  *See Robertson I*, 2012 U.S. Dist. LEXIS 9565, at **15, 19.  In fact, the depletion of WAR's funds was caused by Robertson's self-authorized loans and the loss of more than $1.9 million when he bought stocks with Cartinhour's investment.  Therefore, without a directly-caused injury, all of Robertson's RICO claims fail for lack of standing.  *See Anza*, 547 U.S. at 457*; Lopez*, 657 F. Supp. 2d at 106, *aff'd*, 383 Fed. Appx. 1; *Meng v. Schwartz*, 116 F. Supp. 2d 92, 97 (D.D.C. 1992), *aff'd*, 48 Fed. Appx. 1 (D.C. Cir. 2002); *see also Greenpeace, Inc. v. Dow Chem. Co*., No. 10-cv-2037, 2011 U.S. Dist. LEXIS 101428, at **17–31 (D.D.C. Sept. 9, 2011).

---

[50] Although Robertson vaguely suggests that he was injured by WAR's failure to be profitable and to continue as a partnership (Pl.'s Opp'n at 17–18), that is too speculative to confer standing and, more importantly, nothing the defendants have done caused the lack of profitability.  *See Lopez*, 657 F. Supp. 2d at 114 ("[A] showing of injury requires proof of a concrete financial loss . . . .").

In addition, Robertson's RICO claims against the Charity fail on the merits.  Because

there is no relatedness or continuity, the alleged predicate acts in Counts I and II do not form a

"pattern" of racketeering activity.   *See Edmondson*, 48 F.3d at 1265.  Here, the only predicate

acts remaining are fraud and extortion on the part of TCT, LLC (which is not part of the "RICO

enterprise" and was clearly disavowed by Cartinhour) (Compl. ¶¶ 57, 60, 61); vague allegations

that the Charity extorted some unnamed Serbian business partner at an unknown time (*id.* ¶ 58);

Charity's failure to report the transfer of funds from the United States to Serbia (*id.* ¶¶ 47–49);

and the acts that the SGRO attorney-defendants are alleged to have taken against Gray (*id.* ¶ 89).

These acts lack sufficient specificity.[51]  More importantly, they are not related for they are

dissimilar, undertaken by different individuals, for entirely distinct reasons, and through different

methods.  *See, e.g.*, *Edgenet, Inc. v. GS1, AISBL*, 742 F. Supp. 2d 997, 1019 (E.D. Wis. 2010)

(finding no relatedness where acts "have a different purpose, result, victim, and method of

commission"); *see also Breslin v. Brainard*, No. 01-cv-729, 2004 U.S. Dist. LEXIS 8594, at *10

n. 6 (E.D. Pa. May 7, 2004); *Bonavitacola Elec. Contr., Inc. v. Boro Developers, Inc*., 87 Fed.

Appx. 227, 232 (3d Cir. 2003); *cf. H.J. Inc*., 492 U.S. at 250 (finding acts related where there

was frequent commission of a common act (bribery) of common group (officials) unified by a

common purpose (winning contract)).

    Also, there is neither open nor close-ended continuity here, as there is no threat of future

criminal conduct,[52] nor a series of predicate acts that has occurred over a substantial period of

---

[51] As defendants point out (Cartinhour's Mot. to Dismiss at 17), many of the fraud allegations
would also fail under Rule 9(b).  *See Prunte v. Universal Music Group*, 484 F. Supp. 2d 32, 42
(D.D.C. 2007) (rejecting RICO claim where allegations of mail fraud failed under Federal Rule
of Civil Procedure 9(b).)

[52] *United States* ex rel. *Williams v. Martin-Baker Aircraft Co*., No. 97-cv-2699, 2003 U.S. Dist.
LEXIS 26167, **3–9 (D.D.C. May 15, 2003) (finding vague allegations of "ongoing" fraud
insufficient under Rule 9(b)).

time.  *See H.J. Inc.*, 492 U.S. at 241; *Bonavitacola Elec. Contr.* 87 Fed. Appx. at 232 ("Finding

no relatedness between the . . . separate transactions, [the Court] cannot measure continuity by

collectively considering the numerous alleged acts . . . . [t]hus the Amended Complaint lacks

predicate acts occurring over a 'substantial period of time' necessary for a proper allegation of

closed-ended continuity.")  Ultimately, "[t]he only 'pattern' [Robertson] describes is the alleged

combination of defendants' efforts to his detriment," *Wright v. Towns*, No. 90-cv-0565, 1991

U.S. Dist. LEXIS 12527, at *13 (D.D.C. May 30, 1991), and therefore, he has not stated a claim

under RICO.  *See Edmondson*, 48 F.3d at 1265; *see also Efron v. Embassy Suites (P.R.), Inc.*,

223 F.3d 12, 19 (1st Cir. 2000) (collecting cases).[53]

Similarly, even if he were to have standing, Robertson cannot sustain a RICO claims

against the attorney-defendants.  Since the demand letters and the litigation activity are protected

by the judicial proceedings privilege, only the allegations related to Gray remain.  (*See* Compl. ¶

89.)  Even taking the allegations as true, as we must, this conduct is simply not a pattern: at best,

it involves one victim and one injury.  *See W. Assocs. Ltd. P'ship*, 235 F.3d at 633 ("[I]f a

plaintiff alleges only a single scheme, a single injury, and few victims it is 'virtually impossible

for plaintiffs to state a RICO claim.'") (quoting *Edmondson*, 48 F.3d at 1263).

In sum, plaintiff cannot parse the events underlying *Robertson I* and turn them into

predicate acts to make a RICO case nor can he proceed on a RICO theory where he cannot

establish standing or the elements of RICO.  Accordingly, Counts I–IV must be dismissed.

---

[53] Because plaintiff has failed to state a claim for a substantive RICO violation, his claim for
conspiracy to commit a RICO violation also fails as a matter of law.  *See Greenpeace*, 2011 U.S.
Dist. LEXIS 101428, at *31–32.

## IV.     CHOICE OF LAW

The four common law claims in Counts V–VIII require that the Court first determine the

applicable law. Because this case was transferred, the Court must "apply the state law that would

have been applied if there had been no change of venue."  *Van Dusen v. Barrack*, 376 U.S. 612,

639 (1964) ("A change of venue under § 1404(a) generally should be, with respect to state law,

but a change of courtrooms.").  However, "[t]he choice of law rules of the state of a transferring

court does not follow the case to a transferee court if the originating court did not have personal

jurisdiction over all defendants."  *Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d 103, 112 n.4

(D.D.C. 2011).  In this case, Judge Swain found that she had subject matter jurisdiction in the

Southern District of New York, but declined to consider defendants' challenge to personal

jurisdiction and the parties now disagree as to whether New York or District of Columbia law

should apply.  This Court need not inquire further, however, as there is no real conflict since both

jurisdictions follow the "significant interests" test to determine the state law applicable to

common law torts.[54] *See USA Waste of Md., Inc. v. Love*, 954 A.2d 1027, 1032 (D.C. 2008) ("A

conflict of laws does not exist when the laws of the different jurisdictions are identical or would

produce the identical result on the facts presented.").  Therefore, since "there is no true conflict,

---

[54] The District of Columbia analysis requires balancing the interests of the competing
jurisdictions, including "(1) the place where the injury occurred, (2) the place where the conduct
causing the injury occurred, (3) the domicile, residence, nationality, place of incorporation, and
business of the parties, and (4) the place where the relationship is centered."  *Jaffe v. Pallotta
TeamWorks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004)).  Similarly, New York applies the law of the
state with the most significant interest in the litigation.  *Lee v. Bankers Trust Co.*, 166 F.3d 540,
545 (2d. Cir. 1999).  To determine this, courts consider the parties' domiciles and "the locus of
the tort," which is generally where the injury occurred.  *Id.*; *see also Test Masters Educ. Servs. v.
NYP Holdings, Inc.*,  No. 06-cv-11407, 2007 U.S. Dist. LEXIS 96228, at *10 (S.D.N.Y. Sept. 18,
2007). Here, under either analysis, District of Columbia's law, not that of New York, would
apply, since that is where *Robertson I* was litigated and as such is the primary locus of activity
and injury.

the [C]ourt [will] apply the law of the forum." *Owens v. Republic of Sudan*, No. 08-cv-1349,

2011 U.S. Dist. LEXIS 135961, at * 65 (D.D.C. Nov. 28, 2011).

## V.     FRAUD CLAIM (COUNT V)

In Count V, Robertson claims that "all defendants are liable for damages resulting from

their conspiracy to defraud [him]" and incorporates by reference *all* of the factual allegations in

the complaint.  (Compl. ¶¶ 141–43.)  To plead common law fraud in the District of Columbia, a

plaintiff must state "with particularity," Fed. R. Civ. P. 9(b), that "the defendant, with the intent

to induce reliance, knowingly misrepresented or omitted a material fact upon which the plaintiff

reasonably relied to his detriment."  *Media Gen. Inc. v. Tomlin*, 532 F.3d 854, 858 (D.C. Cir.

2008).[55]  "To prevail on such a claim, 'the plaintiff must also have suffered some injury as a

consequence of his reliance on the misrepresentation.'"  *Busby v. Capital One, N.A.*, 772 F. Supp.

2d 268, 275 (D.D.C. 2011) (quoting *Chedick v. Nash*, 151 F.3d 1077, 1081 (D.C. Cir. 1998))

(citation omitted).

The deficiencies that doomed Robertson's RICO claims apply here as well.   He cannot

prove detrimental reliance because the only damage alleged, the loss of recompense for his in-

kind services, was not caused by defendants' acts.  (*See supra* Section III(B).)  This claim also

lacks particularity, for, despite a rambling 149–paragraph complaint, there is no factual support

for claiming fraud by "*all* defendants." (Compl. ¶¶ 142–43.)  *See Busby*, 772 F. Supp. 2d at 276

("[B]ecause 'fraud' encompasses a wide variety of activities, the requirements of Rule 9(b)

guarantee all defendants sufficient information to allow for preparation of a response."); *Wright*,

---

[55] Because this claim is so lacking in clarity, the application of the significant interests test is somewhat difficult.  However, it makes no difference because New York law, like District of Columbia law, requires a plaintiff to show "a material false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." *Turtur v. Rothschild Registry Int'l*, 26 F.3d 304, 310 (2d Cir. 1994) (citation omitted).

1991 U.S. Dist. LEXIS 12527, at **10–11 (finding allegations that did not identify the speakers, dates and times of the communications, recipients of the information, or substance of the allegedly fraudulent statements were insufficient under Rule 9(b)).  In addition, to the extent that he alleges some type of conspiracy to defraud (*see* Compl. ¶ 143), he cannot do so without meeting the pleading requirements for an underlying tort, *see Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 697 (D.C. Cir. 2009), which he has not done.

## VI.   DEFAMATION AND TORTIOUS INTERFERENCE (COUNTS VI-VIII)

Robertson's remaining claims—defamation, business defamation, and tortious interference—are based on statements allegedly made by unidentified persons to third-parties about Robertson and Gray.  (*See* Compl. ¶¶ 89,107–08,144–49.)

### A.  Defamation/Business Defamation

"In the District of Columbia, 'a statement is defamatory if it tends to injure [the] plaintiff in his [or her] trade, profession or community standing or lower him in the estimation of the community.'"  *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 594 (D.C. 2000) (first alteration in original) (quoting *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984)).  To state aclaim for defamation, a plaintiff must show:

> (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

*Williams v. Dist. of Columbia*, 9 A.3d 484, 491 (D.C. 2010) (quoting *Beeton v. Dist. of Columbia*, 779 A.2d 918, 923 (D.C. 2001)).

In Counts VI and VII, Robertson attempts to hold all defendants liable for defamation of himself and his business.  (Compl. ¶¶ 89, 144–47.)  Relying only on "information and belief,"

Robertson alleges that Kearney and Bramnick or someone acting in concert with them[56]

published defamatory statements to a California attorney who was opposing counsel in

*Robertson*'s California lawsuit (*see supra* note 7) and to Gray's landlord accusing Gray and

Robertson of defrauding Cartinhour and violating federal criminal law.  (*Id.* ¶ 89; Pl.'s Opp'n at

14.)  Obviously statements about Gray do not provide any basis for recovery by Robertson.

Moreover, Robertson acknowledges that he has no identifying information about who made the

statements and admits that neither he nor Gray have actually seen any letter to Gray's landlord.[57]

(Compl. ¶ 89.)  Nor can he allege damages, but instead contends that the statements constitute

defamation per se.  (Pl.'s Opp'n at 14.)

 As an initial matter, the statements are not capable of conveying a defamatory meaning

because they are substantially true.  As plaintiff acknowledges (Pl.'s Opp'n at 13-14), this Court

must first "determin[e] that the publication is capable of bearing a defamatory meaning."  *White

v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990); *Parnigoni v. St. Columba's

Nursery Sch.*, 681 F. Supp. 2d 1, 14 (D.D.C. 2010) ("The first task for the Court is to determine

---

[56] When Robertson raised this previously, Kearney flatly denied contacting the California attorney or Gray's landlord.  *See Robertson I*, Preliminary Injunction Hearing Tr. 63:13–63:14 (D.D.C. Mar. 26, 2010).

[57] The entirety of this allegation is based on "information and belief," and Robertson provides scant basis that would "allow[] the [C]ourt to draw the reasonable inference that [any particular] defendant is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct. at 1949; *see Kowal v. MCI Comms. Corp.,* 16 F.3d 1271, 1279 (D.C. Cir. 1994) ("affirm[ing] the district court's determination that pleadings on information and belief require an allegation that the necessary information lies within the defendant's control, and that such allegations must also be accompanies by a statement of the facts upon which the allegations are based."); *Zelaya v. UNICCO Serv. Co.*, 587 F. Supp. 2d 277, 287-88 (D.D.C. 2008) (finding pleadings insufficient where "plaintiff fail[ed] to offer any information or facts—such as who spoke to Cavalier, when, and what was said— to inform this belief aside from rank speculation [that it was the only possible explanation]").

whether the defendants made a false and defamatory statement concerning the plaintiffs.")

Although *false* charges of criminal conduct are considered defamatory, *Washburn v. Lavoie*, 357

F. Supp. 2d 210, 214 (D.D.C. 2004), *aff'd on other grounds*, 437 F.3d 84 (D.C. Cir. 2004), that is

not the case here.   Robertson was in fact the subject of a criminal investigation by the U.S.

Attorney's Office, which he chose to disclose on the public record.   *See Robertson I*, Mot. for

Stay Pending Civil Proceedings and Lift or Modify Preliminary Injunction at 4–5 (D.D.C. Mar.

21, 2010); *see also Robertson I*, Preliminary Injunction Hearing Tr. 55:04–55:10 (D.D.C. Mar.

26, 2010).   In addition, the *Robertson I* jury found that Robertson was liable for breaching

fiduciary duties, legal malpractice, procuring the Indemnification Agreement from Cartinhour

through undue influence and/or coercion, and awarded compensatory as well as punitive

damages of $3.5 million.   *See Robertson I*, Verdict Form (D.D.C. Feb. 18, 2011).   In light of

these undisputed facts, there is no basis for a defamation claim.   *See Jolevare v. Alpha Kappa*

*Alpha Sorority, Inc*., 521 F. Supp. 2d 1, 13 (D.D.C. 2007) (finding no defamation when "the

'gist' of the statement is true . . .  as it would be understood by its intended audience.") (internal

citations and quotations omitted)).

    These claims are deficient for additional reasons as well.   To the extent that this

communication was made by Kearney and Bramnick and related to *Robertson I*, which it did, it

is protected by the judicial proceedings privilege.   *See Messina*, 260 F. Supp. 2d at 177–78.[58]

And finally, the unfounded allegation of conspiracy (Compl. ¶ 145),[59] provides no basis to hold

---

[58] Since this jurisdiction recognizes the privilege as "absolute rather than qualified," *McNair*
*Builders, Inc.*, 3 A.3d at 1139, the single New York trial court case Robertson cites to argue the
contrary (*see* Pl.'s Opp'n at 14–15) is unavailing.

[59] A plaintiff alleging a civil conspiracy "must set forth more than just conclusory allegations of
an agreement [between the co-conspirators] . . . ." *Brady v. Livingood*, 360 F. Supp. 2d 94, 104
(D.D.C. 2004); *see also Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 113–14 (D.D.C.
2010) (conclusory allegations of conspiracy without factual support are insufficient ); *Bush v.*

Cartinhour and the other defendants liable. *See Chandler v. Jones*, 802 F. Supp. 2d 13, 21

(D.D.C. 2011) (dismissing claims where "complaint utterly fail[ed] to show or allege any

wrongdoing" on the part of defendants).

### B. Tortious Interference

Under District of Columbia law, a plaintiff claiming tortious interference "must plead

'(1) the existence of a valid business relationship or expectancy, (2) knowledge of the

relationship or expectancy on the part of the interferor, (3) intentional interference inducing or

causing a breach or termination of the relationship or expectancy, and (4) resultant damage.'"

*Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (quoting *Bennett Enters. v. Domino's*

*Pizza, Inc*, 45 F.3d 493, 499 (D.C. Cir. 1995)).

In Count VIII, Robertson alleges that the communication with the California attorney and

Gray's landlord tortiously interfered with a payroll tax recovery business that he and Gray had

planned to start because it dissuaded Gray from going into business with him and caused

"damage[s] in an amount yet to be determined."  (Compl. ¶¶ 107–08, 148–49.)  Essentially,

Robertson seeks an unknown amount of damages for some undefined injury to his ability to

pursue a business that did not exist based on a call by an unknown attorney whom he believes

was from the state of Maryland.  (*Id*. ¶¶ 89, 107–08, 148–49.)  Not surprisingly, this claim fails

for a host of reasons.

---

*Butler*, 521 F. Supp. 2d 63, 68–69 (D.D.C. 2007) (dismissing conspiracy claim where plaintiff's
allegation of an agreement "provide[d] no description of the [specific] persons involved in the
agreement, the nature of the agreement, [or] what particular acts were taken to form the
conspiracy"); *McCreary v. Heath*, No. 04-cv-0623, 2005 U.S. Dist. LEXIS 34082, at **17–18
(D.D.C. Sept. 26, 2005) (dismissing conspiracy claim when the plaintiff's "162-page complaint
fail[ed] to allege the existence of any events, conversations, or documents indicating that there
was ever an agreement or 'meeting of the minds' between any of the defendants"), *aff'd*,
*McCreary v. Heath*, No. 05-5405, 2006 U.S. App. LEXIS 4951 (D.C. Cir. Feb. 22, 2006).

To state a claim for tortious interference in the District of Columbia, the business

expectancy must be "commercially reasonable to anticipate."  *See Browning*, 292 F.3d at 242

(internal quotation marks and citation omitted). "A valid business expectancy requires a

probability of future contractual or economic relationship and not a mere possibility."  *Wash.*

*Metro. Area Transit Auth. v. Quik Serve Foods, In*c., No. 04-cv-838, 2006 U.S. Dist. LEXIS

24510, at **17–18 (D.D.C. Apr. 28, 2006).  Robertson's imagined economic gain from a non-

existent business is nothing but speculation.  Furthermore, there is no factual basis in the

complaint upon which to infer that any defendant knew of or intended to interfere with the plan

to start a business. *See Browning*, 292 F.3d at 242.  Accordingly, Count VIII will be dismissed.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motions to dismiss.   A separate

order accompanies this Memorandum Opinion.


_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:   March 16, 2012